In our position, it should have been arbitrary and capricious, because it is our position that it should have been arbitrary and capricious, because it should have been arbitrary and capricious, because it should have been arbitrary and capricious, because it should have been our client needed to be the proper party. The judge got us on the line and we told the judge that we would waive service, we would answer the complaint and we would proceed with our Summary and Judgment Motion immediately. So you called MetLife and said wait a minute, there's a problem? MetLife contacted us, we were unaware of the lawsuit. Because if MetLife was named and misaddressed and did not notify us, it was within weeks of when we were, within days of when we became a part of the lawsuit. So within days, then why did it take five months to say that there was the wrong defendant here if there wasn't the misapprehension on behalf of MetLife when it made the decisions that in fact it was funding the plan? Well, that's a question for MetLife, not a question for me. I wasn't a party to that. I have not spoken to any of the counsel about what went on in those five months. Does it raise an inference? I don't want to speak for Judge Amber, but he's asking. I think, does it raise an inference that the sort of structural defect that you had in a case like Pinto, even if it technically didn't exist here, if MetLife thought it existed, then that's another reason for heightened scrutiny, right? If MetLife thought it was the funder, or at least some form of heightened scrutiny. And my position is MetLife is a very large organization. We have specific claims administrators who handle the limited brands as the entity that employs them.  No, I don't. I do not believe. I do think that it's an issue that we want to address. We think it's an important issue because, one, we don't think there are structural issues because an attorney who makes a mistake as to checking with his client or her client to say, are you the proper defendant? Certainly, when that attorney is not even my client's attorney and is in no way involved in the review process, to hold that attorney in those five months somehow at issue with the plan itself, I would find to be something that would force us to have no other choice but to redress, but then to go up to a thousand percent like that. Yeah, I think the judge here said, was it Judge Savage, is that right? Yes. Said it didn't make any difference to him what the standard was, even if it was de novo, he was going to go the way he was going. In short, if it was arbitrary and capricious, full deference review under Judge Savage's view, you still lost, right? I believe Judge Savage said that. Did we say that? Yes, and our view is, and I can go through the facts, we went under either standard of review. There's three issues that we see for this appeal. One is the standard of review. Like I said, I believe it should be arbitrary and capricious, but under any sliding scale standard, I think the facts in this case, the administrative record in this case, establishes that this decision was based on the administrative record and consistent and pursuant to the plan. The second issue is, did she satisfy her own occupation standard? The first 12 months under the plan, she had to establish that she was disabled from her own occupation. But they gave her that, right? She got the first 12 months, did she not? No, no, no, no. She was an employee from 1997 through 2003. In 1998, she was diagnosed with MS. She worked for five years. Was she diagnosed in 1998 or 2000? 1998, and she worked for five years with MS. Okay, I'm sorry. I thought she had symptoms. She was diagnosed in 2000, but you're wrong. You granted, or your client granted benefits and then sent another letter saying, oops, change your mind, you don't get benefits. And if I understand correctly, there's a citation to an unnamed physician reviewer when these benefits are withdrawn, correct? Well, let me explain. The district court's opinion, I think, on some of these procedural issues, you need to look deeper into the administrative record, because on these points, first of all, what occurs in January 2003, her physician said, based on my patient's subjective complaints, there was no objective changes, and the doctor's own notes show that there was no objective changes in the MRI or anything else to show that the symptoms had changed over these five years, that it had gone from, it had worsened at that point in time in January 2003. Doesn't MS normally just go in plateaus? You go for X number of years in plateaus, and then eventually you go down to the next plateau, and you can maybe even have periods of remission for some time? Your Honor, based on the administrative record, I would agree with that. The lower court asked if I was an expert in MS, and I professed at that point that I'm not. Just looking at it now, it seemed like what was called relapsing, recurring MS. If you were given a list of baddies, diseases to have, MS ain't one of them. I'm not trying to minimize MS, and I'm not trying to say this isn't about whether MS is a good disease or a bad disease. This question is simple. Whether she was disabled as of March 2003 from her occupation, and if I could, just to clarify the record, her physician did not say she couldn't work. Her physician said she can work as she deems it appropriate from January to March. And she came back for six weeks? Well, if I could just go to this one point. Yes, she did. The one point is from January to March, she was off work, and MetLife simply said, we're going to let you off work without any medical documents aside from this slip. We're going to let you off work. If you can't return in March, as your doctor is saying, that's when you're going to return. Then we're going to need the medical documents, and that's what occurred. And I thought that MetLife had said in denying benefits, well, your doctor hasn't stated any restrictions or limitations on your work, right? No, it depends on what step you're looking at. There's a number of steps that we have during this process. We have the March 2003 termination of benefits, in which that's the initial review where we have the notes from December 2003, and there's a review in March 2003 where there's a denial. And there wasn't a specific statement in denying the benefits that, oh, your doctor hasn't put any limitations on it, so we don't view Dr. Tatarian's commentary as saying you can't work because he didn't put limitations or restrictions on it? I certainly would not frame the evidence as that. In March 2003, they looked at, here's an individual who had worked for five years with MS, and they were looking at, okay, if you were able to work for year 5, 4, 3, 2, 1, what is different now? They looked at the objective findings in March based on the records that were provided to them. She provided records in March 2003. Those records did not support a finding of disability. She appealed, and as Your Honor noted, she also went back to work part-time. When she went back to work part-time, her physician released her to return to work and released her, although part-time, without restrictions. If she thought she could do it, and she made an effort for six weeks? Well, certainly. We're not saying to – I simply raise it she went back to work. She appealed the decision, and in that appeal, and counsel who later came into the case said that the appeal was not well done. The appeal contained very few medical documents, and again, there was no change in the neurological condition. We still have the same condition from point one to point two, objectively. Subjectively, she's saying different. There was, I think, some misreading of some of the objective. I mean, for example, the statement by Ms. Phillips that there was increased tone. She was taking that to be a good thing when, in fact, with MS, quote, increased tone, close quote, means that there are likely additional lesions on the brain. Isn't that correct? I don't disagree with that statement, but as likely additional lesions on the brain, we have the MRI at that time that her own treating physician, neurologist, had said that not only had it not gotten worse, it had, in fact, gotten better on the MRI. But isn't there a problem with saying this – I take it from your opponent – is that you guys are given to cherry picking, that you'll look at one thing that Dr. Tatarian says and you ignore everything else he says, or you'll look at this piece of evidence and you'll ignore that. So if Dr. Tatarian says she's lost her bladder control, she's fallen down, her vision's bad, she's dizzy, she has constant fatigue and weakness, that you say, ah, it's subjective complaints. We don't need to listen to that. He did say, however, that her MRI was looking good, and we're listening to that. Now, I'm under the impression that in this court's previous jurisprudence that that kind of selective acceptance of a doctor's commentary and rejection of other stuff that appears to be self-serving creates a problem for a plan administrator. Does Pinto not say that? I would agree on the basis of the law that you're stating, that in the Third Circuit that there is a procedural defect if that were done, if there was selectivity, if there was cherry picking. I would submit that if you look at this administrative record, the first appeal that went through, the date in question is March 2003. If we look at the medical records that were submitted up to the first appeal, before the request for reconsideration, they said, well, look at new records. At that point in time, until July 2003, her own physician was simply stating that objectively everything is, there's no difference, she is reporting to me symptoms, but he is not saying you can't work. He is saying you work whether you want to or not. I would argue that this isn't even a battle as of March 2003 of one physician saying she couldn't work and her physician saying she could. Is that game up at March 2003 or does the fact that there's later review by MetLife and later information provided have legal consequences? It's all coming later. Dr. Terry, wasn't it November of 2003? So we're still in 2003 where he's saying it's, in effect, it's getting worse. Exactly. What he is saying is he doesn't say it for eight months after the date in question. But you still turn her down. That is the point. Well, it's March 2003 and the point that, if we're looking at procedural irregularities, if you look at the doctor's notes from the visits and then you look at when the attorneys get in, post-appeal, request for reconsideration, who is the November 2003 letter written to? An attorney. And all of a sudden, it goes from objectively she is, her MRI is the same and objectively I don't know why she is experiencing these different symptoms because she has worked for five years and, if anything, her MRI has improved to now she simply can't work. And so if there's a procedural irregularity, I would submit that it's that the physician from January 2003 through November is consistent with MetLife. Back to Judge Short's point. I mean, Dr. Greenwood was your doctor, is that correct? One of the consultants who reviewed the file. And he, for example, just back to the increased tone, didn't he say that increased tone in the lower extremities should lead to a further limitation of her physical activity? Yes, I believe on A198 he said in view of reported falls, increased tone in the lower extremities and alleged difficulty with balance, et cetera, that there is some of the lower extremities repetitive use. Absolutely. So, again, I would say that to say that we selectively looked at this file or cherry-picked from this matter, simply we... But that wasn't taken from the sources. Well, the point is that I thought Ms. Phillips was talking about increased tone as being a good thing and yet you're one of the persons, you consulted, saying increased tone is not a good thing. I would agree. And here MetLife is seeing from the physician that, yes, exactly what you're saying and MetLife reviewed that and the physician reviewed that. The physician said despite the increased tone, she still does not satisfy as of March 2003 the disability standard under the plan of her own occupation. No, no, Mr. Campbell, your red light's on. Let's hear from Mr. Goulding and then we'll have you back on rebuttal. Thank you very much. Good afternoon. Good afternoon, Your Honor. May it please the Court. Alan Goulding on behalf of Jacqueline Addis. Just a procedural question. Why did you sue the wrong defendant at the beginning? Because throughout the process, the understanding was that MetLife was the proper party. They were both the administrator and the funder of the plan. Did the plan documents indicate... They don't seem to indicate that MetLife does any of the funding. That was the understanding from the outset of the litigation and it wasn't... How did you arrive at that understanding because it doesn't seem... I couldn't find it. I believe through the appeal process with MetLife that that understanding was developed. It turned out to be wrong, but that was the understanding that occurred as a result of the appeal process that took place with MetLife. When did you find out that that was the wrong assumption? Five months after the lawsuit was started, which is the point that we made in our brief and that you addressed earlier. I can understand. It seems like the parties were working under a misapprehension. Correct. But when the case is brought... I'm not saying... I don't even know if you were a counsel at the outset, but when the case is brought to you, isn't the first thing you look to are the plan documents to see who funds what? Isn't that one of the first things you look at? In other words, is MetLife just a pure administrator or is MetLife a dog in the fight? Well, at this point we understand they are nothing more than the administrator. At the time the suit was started, there was a misconception that they had a dog in the fight. All I'm saying is wouldn't the misconception have been eliminated by looking at the plan documents? It should have been, but it was not. It was overlooked. But the fact remains that MetLife for five months operated under the same assumption. Let me ask you something, if I might, Mr. Goulding. If you would respond, Mr. Campbell says, if I understood him right, after March 03 really doesn't make any difference what was going on. The question is what was going on as of March 03, and as of March 03 Dr. Tatarian said she can go back to work when she decides she's medically fit and objective evidence was unchanged. Therefore, that is the only determination, and looking at that record at that time, it wasn't arbitrary and capricious to say she wasn't disabled. What's the response to that, that March 03, that's it, say no more? I think that he would like to take that very select period of time, but the fact is that on review we're looking at the entire administrative record,  and then their second refusal to reconsider. You can't just choose to take for purposes of this case. The disability determination is as of March 03, but the administrative record as a whole tells you whether she was, or should tell you whether she was disabled as of March 03. Correct. Is that your position? Yes. Okay. That they made the decision in March 03, which we contend was both wrong, but also a reflection of their practice of selectively looking at records. That practice persisted throughout the entire administrative record, and in fact led the trial judge to actually characterize the denial process as one of predetermination, which we think is a very good framework for where Ms. Addis finds herself at this particular point in time. If we're under a different standard of review, is the result the same here? Yes. The standard of review, as Judge Savage noted, he employed a moderately heightened standard because of the procedural bias that he found throughout the entire review process. But he also commented in his opinion that even if he had not used the moderately heightened standard of review,  that their decision was not based on any reasonable grounds, that it was simply the result of their selective review of these records. And as a result, regardless of what standard of review you choose to use, the trial court found that their conduct was arbitrary and capricious, which then leads to the next question is, is there anything in the record which would support their contention that she was capable of performing her job? And the fact is that the record is devoid of anything of that nature unless you engage in the process that they did, which is, as you put it, cherry picking. And that's precisely what the trial court found that they did. And he cited numerous examples where they did this, some of which have already been highlighted by the court. That process, whereby they had already decided they were going to deny the benefits, caused them to, as the court has recognized, simply select portions of records that favored their result and to ignore those that did not. And the result was that they kept coming up with the same conclusion that this woman is capable of performing her own occupation despite the fact that the physicians indicated that she was not. And the result was that they just kept coming up with the same result because they employed the same process over and over again. And if she could not perform her own job, then she could not perform any other job. Correct. And that, I think, leads us to the remedy issue that they raised, which is that they should have been given a second bite of the apple, if you will, because they never had a chance to make a decision about whether she qualified under the anti-occupation standard. But effectively, they made that decision. When they decided that she could not perform her own occupation, both in September of 2004 as well as at all times prior to that, they effectively answered the question that she was not able to perform any occupation or wouldn't meet the anti-occupation standard either. So their contention that the court erred because it fashioned a relief that brought the parties back to the position it would have been in had a fair review occurred is simply an illusion. Should she have filed a separate application for relief? If I understand the way the system works, you get the first 12 months if you can't perform your own occupation. Then if you want continuing benefits, you have to show you can't perform any occupation. Yeah. I'm sorry. And should she have made a separate application that said, I can't perform any occupation? Or was what she filed here enough to get her to the point where Judge Savage took her? I think what she filed here was sufficient. Why? First, when the second reconsideration was requested, this occurred in April of 2004, which was at this point in time more than a year after the initial claim. So we were into the anti-occupation standard review. She asked for a review of both standards. Now, MetLife chose not to perform the second review, if you will, but any occupation standard. But when the court looked at this, it determined that under the own occupation standard, she demonstrated that she was unable to perform that. So they fashioned a relief that provided her those benefits. At that point in time, once they determined that she qualified there, MetLife would have then and has now the opportunity to ask for a review to see if she meets the anti-occupation standard. So I'm not sure that it's incumbent upon the claimant during the review process to now indicate, I want a second review at a different level. But in this case, she happened to do that on the reconsideration. And again, I want to emphasize that they could not have had any other determination other than she didn't meet the anti-occupation standard either because they already determined that in their view, she didn't meet the own occupation standard. It was a superfluous issue and one that they now wish to raise because they don't want to be bound by the remedy fashioned by the trial court, which is put the parties in the position they would have been in had a fair, impartial review occurred. I don't want to belabor this issue any further. Thank you very much, Mr. Goulding. Mr. Campbell? Thank you. I just have four points that I want to address. First of all, the plain language A-208 clearly spelled out who was the proper defendant to be sued. And so certainly our client, the defendant, should not be held responsible to a lower standard because that was not reviewed by counsel. Number two, I want to address exactly what I was saying as to the March 2003 date. I did not say that the rest of the administrative record is irrelevant. It's just simply if it is something that occurred in, say, March 2004, her objective findings a year later changed drastically at that point to the negative. It is our position that that does not alter the issue of whether she was disabled in March 2003, the date in question. So what you're saying, if I got you right, is an administrator can look at what it views to be the objective evidence. It can reject the subjective complaints. And when later evidence verifies the subjective complaints, it can reject that because it was okay to reject it when it first rejected it. Am I following your line of argument? No, if I could address it. The subjective issues were in no way simply rejected or not considered. We went through a review process where her own physician was saying, and until November 2003, her own physician was saying, objectively, there is no change. She worked for five years and objectively. No, you keep saying her own physician said there was no change, there's no change. I've read the record. I've read what Dr. Terry had said. Back in March, he was talking about the complaints she was giving, and the complaints she was giving in March were pretty darn significant. He was finding things. He was just saying that she appears to be doing okay neurologically compared to before, but there were things like brain lesions, additional complaints, difficulty walking, incontinence, fatigue. It's hard to say she wasn't getting worse. What I'm saying is there's two points, and I'm not saying that the subjective exists. I was saying there's objective and there's subjective. There was the MRI that was done annually and the checkups because the doctor wanted to see, objectively, are the lesions. Is this condition worsening from an objective standpoint? And the lesions were increasing. I would submit that they were not. And for the two years, if you look at the administrative record, as of January 2003, her own physician said that the MRI had actually improved, not worsened. It had actually improved, and that's directly from the administrative record. As to the subjective issues, it is simply here's her own physician until November 2003 stating she is reporting different symptoms. I don't know if it's due to depression, if it's due to her feeling the physical effects more, focusing more on it, or whether it is just simply her symptoms have been different. She hasn't realized worse than in the beginning. She hasn't realized that. You said November 2003. Did you mean March? Prior to November 2003, he is saying that, these points. He's saying, objectively, the MRIs, the own tests that her physician is doing to see, are you improving? Are you worsening? There are reasons for those tests. And I would submit, yes, we listen to the patients. But if I go into my doctor and say I am having physical ailments and I have pain all over there, certainly doctors are there to, that doesn't mean if they can't find a reason that I'm not experiencing the pain, but it does mean that the doctors are running tests for a reason to see how can I correct that. When you say you don't look at those things, evidently Judge Savage was under the impression that that is what you were doing, was only looking at those things. Or at least they're the only things that you thought were meaningful. Because when she says, I'm falling down, I can't control my bladder, I'm afraid I can't control my bowels, I'm weak all the time, that the response from MetLife is, your MRI looks the same to us, in effect. Now, if you say you do look at it, but how do we see in the administrative record evidence that you took seriously what her treating physician and her treating chiropractor said are very serious complaints by this woman? The best evidence is a physician consultant review that the district court took such great issue at Dr. Greenwood's review. As we pointed out on the questions and answers table. His specialty is internal medicine and infectious diseases, is that correct? I believe that is correct. That clearly does not make you the same kind of expert on MS that a neurologist is. He never looked at the woman, did he? He never saw her. No, he did not. I'm just simply stating that he, in fact, explicitly addresses the subjective complaints and points those out. The administrative record, in our view, does address it. The one important issue that I have not yet addressed, and I want to, the anti-occupation standard. It is absolutely the first level review in ERISA. And the whole reason why we have our procedural and structural defects is the administrative process. If Judge Savage had reviewed this and found that she satisfied the ONOC and denied it and said that she didn't satisfy the ENEOC, we would be up here on appeal right now and presumably we would hear from Ms. Addis' counsel arguing whether there were structural or procedural deficiencies with not the plan administrator, but with the district court of the Eastern District of Pennsylvania. We must have the claim administrator first review it. And to say, did they ask for it? They did not. They had a claim on March 2003 on her own occupation. That went through the process. It was denied. There was an appeal denied, request for reconsideration, not of the ENEOC. It was a request for reconsideration, which Ms. Addis' counsel said the record is not good. Can we supplement it for you to review? MetLife said yes. They didn't have to. They said you could go to court now. They said yes. It wasn't this review ENEOC. It was simply, will you reconsider your ONOC? So I will submit, number one, it was not presented at MetLife. Number two, how could it have been? They had decided against, and you may disagree with that decision, but they decided against the ONOC. If she could work in her ONOC, what would they have found? They would have clearly found that there was some occupation that she could do, her own occupation. And had they found that, think of what Judge Savage would have done. Well, they answered his point, which is it makes it a nullity. for her to have had to say, consider me for any occupation, for exactly the reason you're saying. As a matter of law, tell me why that's wrong. Because under ERISA, we're bound by the law. And in this court, and the plan, and the claims administrator, and Ms. Addis are all bound by ERISA, which says the plan says the claims administrator reviews it first. The claims administrator makes the decision. That's like saying in this prior case here that the 12B6 motion should have been ruled on and the district court judge should have also ruled on a summary judgment motion at the same time to say, if you lose on the 12B6, if you ultimately reverse, here's my summary judgment decision here. And look at this case. If in this case we had MetLife go through, and what would be done for the NEOC? There would be a functional capacity evaluation. We're certainly not submitting that everybody with MS can't do any occupation in the world. She worked for five years here. We're going to do a functional capacity evaluation. We're going to look at the other jobs in the market. We're going to see what jobs are available. We're going to see what her qualifications are. She was a store manager. If she can't do that job, if this court were to find it, there's certainly other jobs in the world that are gainful occupations other than store managers that she could do that would be sedentary, for example. Mr. Camels, thank you very much. Very well argued by both sides. We'll take the matter under advisory. Please rise. This court is adjourned until Tuesday, January 8th at 9.30 a.m.